Good afternoon Madam Presiding Judge and Members of the Court. I was going to start off with something I had prepared, but it seems to me that the very essence of this case, if we were to take Arkham's razor and cut it right down the center, would be the issue of due process in relationship to the issues relating to the totality of the circumstances by the judge in making determinations of credibility where his decision may be impacted by his bias and cherry-picking of specific items in relationship to find lack of credibility. Also, the issues that relate to whether or not, under the REAL ID Act, that we deal with in relationship to what is the duty and responsibility of a Respondent, I mean of a, of someone, an applicant, or the appellant here, to go out and obtain additional documentation to satisfy an inquiry by an immigration judge who is in, who says he has problems with the issues of credibility. Can I ask you just to pause here for a minute and see if you can help me? I'm trying to see if we're all on the same page or not with respect to the actual determinations that were made by the immigration judge. And it looks like he made an adverse credibility finding, but it's not clear to me beyond that if he said, and I don't think he or she, the immigration judge said, you know, even if she's not credible, I find that she's not, hasn't met her burden here to establish asylum. What's your view of that? Because he does go on and make some statements related to the actual merits. So what is your view? My view is he didn't make that step. He didn't do that step. He didn't say, but in light of the fact that there was incredibilities, I find that certain things are credible or not credible. And when you look at what was actually going on, and one thing I'd point out is that a respondent in their brief at page 47, line 10, indicates that the actions of the immigration judge in regards to our due process argument should be not considered because of Mara Merrill versus Sessions. But is it your view, I guess, it looks like the IJ and the BIA acknowledge that the petitioner here suffered harm, but it's not clear to me if the IJ or the BIA agree that she was, you know, raped. And I'm trying to figure out, do they agree about the level of harm and disagree that she suffered hands, you know, suffered the harm at the hands of the government? I just would like to know for clarity whether the IJ and the BIA agree with the terms of, in terms of the harm that she suffered. And, Your Honor, that was one of the problems I was going to address because I don't see it either. When I look at the record, all I see is if he's saying she made no harm, his determination that no harm existed cannot follow from the record itself because there is medical documentation that supports the rape and the beatings. And in this case, it seems to me that you just can't say that she wasn't harmed. Even if you go back and you look at everything that took place, her testimony is very consistent about what happened when she was taken. And other than her testimony, is there other evidence that she suffered harm at the hands of the government? Well, yes. There's the – well, that she suffered harm, for sure. There's the documentation by the hospital itself and the medical treatment that she received. In addition to that, there are the statements of her mother, her brother, her brother-in-law – I mean her mother, her sister, her brother-in-law, and several other people that knew her at the time and indicate that she was involved in setting up this – this organization, which was – Independent youth. Independent youth. Independent youth. So there's corroborating tests. There's corroborating statements. But he – the judge refused to consider them because they were, you know, her parents. He wanted – he wanted more evidence. And the evidence that he wanted was he wanted her to go out and contact the people still in Armenia who are under threat of violence and try to get statements from them. Can I diverge by just a little bit here? As I read both the decision by the immigration judge and by the immigration appeals, both held – both gave an adverse credibility finding. Neither, as I read what they say, did they – neither of them said, if true, this does not rise to the level of persecution. They just didn't say it one way or the other. No, they didn't. So the only thing in front of us is the adverse credibility finding. Could you address the question – and I'm not sure how much difference it makes, but the IJ and the BIA seem to think it made a lot of difference as to whether or not there was a third person in that building. You know, I have that argument because I don't think it makes a difference. Because the question is, is there three people or two people in the building? If there's three people in the building, it indicates there's more people that were involved in this situation. And when she says there's only two people in the building,  I think what they're intimating is if she says there's two but there were really three, then somehow she's not credible. So that brings us to the – may I just finish the question? Oh, sorry. Thank you. That brings us really to the heart of this. Is there anything in the record that suggests that another and other, which are very close in English, that there's some similar linguistic relation in Armenian? And I think that was the point that was inquired into at the hearing, and they asked the translator to respond to that, and the immigration judge said no, disallowed him from being able to do that, which goes to the issue of bias. Disallowed the translator from doing that, I gather, because all we had were the two different English translations. We did not at that time have the underlying Armenian document. That underlying Armenian document, as I understand it, was provided as part of the supplemental evidence, but nobody ever went back and asked the question once they had that document in front of them. Right. So it's not translated. We have a document. We have the document. Nobody translated it. Yeah, I see your point. Well, I mean, I don't know what my point is. You know, I don't know what the legal implications of that are, but it does seem a very odd thing where this is a flashpoint at the hearing, and then here we are, and we're left with no answer to the big question. And, Your Honor, one thing I would say is it doesn't matter to a woman when she's being raped how many people are in the room. And the transcript itself — But that's not the point. The point is if this is a made-up story, and one of the reasons you might think it's a made-up story is you can't keep the story straight. And if the English translation is accurate, at one point she writes, well, there were two people there, and another person comes into the room, making it three. But her testimony in front of the IJ was absolutely consistent and very clear. She says, no, there were only two. Now, I don't know whether that makes any difference or not, but the argument is, well, she can't remember the story, therefore it's not true. But, Your Honor, I also think that it goes to the issue of whether or not it is an insignificant difference, because it could have been the other. Well, if this were pre-Real ID Act, that's absolutely right, because it simply does not go to the heart of the story. And it may or may not be a conflict, really, depending on what the answer is in terms of tracing it through the declarations. Now, Your Honor, one of the early ones was thrown out because she said that had some problems. So do we look at her testimony at the hearing plus her written submission? Well, I think you take a look at her testimony at the hearing, her written submission, and also, to a certain extent, it is supported by her statement in the asylum interview. Her statement in the asylum interview is consistent. So, I mean, if there's a minor inconsistency or I don't even really think it makes much difference how many people are in the room. We clearly have difficulty with the translation because her lawyer, I think that was not you at that point. That's correct, Your Honor. I just stepped in for oral argument. Brings in a second translation. The first translation entirely leaves out what she claims is in the Armenian, that she ran into the rapist at some later time. I'm not finished yet. And the claim is that's a problem with the translation. And the IJ is understandably skeptical of that. He says that doesn't sound like a translation problem. It sounds like you left it out. But then it turns out that it probably is left out because at the very beginning, the notes of the credible fear interview, she says exactly that, that she'd run into him. So it's not a later made-up story. So it's obviously we've got some problems with the translator, certainly the first one. Whether we've got problems with the second one, I don't know. And clearly, Your Honor, I mean, the assignment interview, you're right, says that, the exact same thing. All right. Thank you. All right. May it please the Court, Victor Lawrence on behalf of the Acting Attorney General. This Court should deny this petition for review as substantial evidence supports the agency's adverse credibility determination. And could you run through that substantial evidence? And I think we're supposed to just look at what the BIA said. Correct. The BIA's decision is what's before the Court. Right. And it discounted some of the things that the IJ used to justify his adverse credibility findings. So I'm just going to look at what the IJ said supports the adverse credibility, what the BIA said supports it. That's accurate. Supplemented by what the immigration judge said in his opinion with respect to those particular items that the Board adopted. Yes. We're on the same page. Okay. Great. So, Your Honor, I asked what the adverse credibility was. What are the points left once the BIA mixes a couple of them? Sure. Exactly. There are three things. First, I'm including the failure to corroborate as part of the adverse credibility because this is an asylum claim in which you have to show persecution on account of political activity in this case. Right. The immigration judge questioned whether or not she was really engaged in a political activity and asked her to supplement with certain items such as the bylaws of this organization that she said that she created, that she said she gave to the Ministry of Justice in Armenia, as well as photographs that demonstrate police presence at rallies. When she couldn't come up with that corroboration, the immigration judge correctly determined that- Well, she came up with some corroboration. She came up with a statement by a member of the organization that stated, I'm unwilling to give my name for fear of being punished by the Armenian authorities. However, her lawyer said the name of the person is X, so the lawyer gave us the name. I understand that the lawyer himself is not capable of doing the affidavit, but we do have the statement that is corroborating, if you believe it. The statement corroborates the fact, if you believe the statement, which is unsigned and undated and not attributed to a particular person, at least in the body of the declaration. Right. It corroborates the fact that there was this organization. It doesn't name the organization, this independent youth. It just says that there was this organization. Right. But she claimed that there were bylaws and there were pictures of police abuse at rallies. And she even said, I believe it's page 198 of the record, that she had those photos. And then she never produced them. So the immigration judge found that this reflected on her credibility as well. But to fully answer the original question from the Court, there's the lack of cooperation, but there's also the demeanor evidence, which the Board agreed with, with respect to the immigration judge's findings, as well as the inconsistency. And the demeanor evidence, could you review that for me? Basically, the demeanor evidence, he says, she was evasive. So it's not as though she rolled her eyes in the sense that it's something I can't see, but it was evasive in the sense of the substance of her answers. And I can read the transcript. You can, Your Honor. But evasive and both, both evasive and unresponsive. Well, I know. But, again, that's, I can read the transcript to see whether the answers are evasive or nonresponsive. True. But, you know, as this Court has indicated in the Mains decision, immigration judges are in the best position to assess demeanor and other credibility cues that the Court cannot readily assess on reviews such as this. But where was she nonresponsive? I don't understand. I'm sorry. Where was she nonresponsive? Because when we refer to that in other cases, at least, it seems like couldn't answer, long pauses. The immigration judge then thinks, oh, then she's not, whoever, the petitioner doesn't know, you know, what they're talking about, really. They can't come up with a response. Here, the nonresponsiveness was not that kind of nonresponsiveness. It was, you know, she responded and then he didn't believe her. So I'm not sure that that turns on demeanor as much as it does was there evidence to support that we can point to in the record, in the transcript. Two things in response to that. First, the REAL-ID Act itself notes that, quote, an alien's demeanor, candor, or responsiveness are relevant factors to a credibility determination. So if you want to fault the IJA for calling demeanor and responsiveness the same thing. I don't want to fault. Where is it? Where do we see it in the record? The responsiveness, sure. Like on the bylaws, for example. I felt like she couldn't get a word in edgewise on answering that with all the interruptions. So I don't know if that's being nonresponsive or not. Well, look at pages 197 and 198 of the record, for instance, where he's asking her about the photographs that she submitted with her asylum application. And he says, and the immigration judge is trying to understand what do these photographs show. And it took several iterations of that question for her to admit that those photographs that she submitted with her asylum application don't show any harm or persecution by Armenian police. Yeah, but what's – I mean, she's – in the end, she says what they – they don't show – they show that protests were happening. That's what I think the bottom line was, correct? Not necessarily a police response to that, but that there are such protests. Right, yes. But again, at those two pages that I indicated, first she's indicating that the judge is specifically asking her what do these photos show. And she starts talking about other photos that she submitted to the Ministry of Justice. And it took a while before the immigration judge got her to clue in exactly what do these particular photographs show. So he felt that she was being nonresponsive. The other – I mean, you know, it's hard to get a perfect witness. Any of us who have been a trial lawyer know that. And I mean, she answered the question. Now, maybe in the end they don't show much because they show these people protesting, but they don't show the government doing anything. But it kind of befuddles me as to why that line there would be an adverse credibility foundation. Well, so the immigration judge looked at that testimony with respect to the photos, looked at the testimony with respect to the bylaws where he's asking her questions about that and wasn't getting specific answers, even though she was heavily – claimed to be heavily involved in creating the organization. But remember, in the Maine's decision – and I know it's a little different, Your Honor, with respect to the long pauses that were present in the Maine's decision. But here, again, it's the immigration judge looking at the witness as she's trying to answer these questions and making a reasonable judgment on her credibility. And, you know, one thing that the court said in Maine's is that the immigration judge should be very careful if he's going to find adverse credibility on demeanor or on responsiveness to specifically document those particular instances. And that's what the immigration judge tried to do here. I completely understand that point you're making. It's well taken. But it's being categorized as demeanor when, you know, the evasive and nonresponsive. I'm not quite sure this fits as neatly as maybe you think it does because she did produce. I mean, it's a question of, you know, whether there's substantial evidence overall, what we have to determine. And the question is, did she produce things here? And the specific finding of the IJ is that, oh, because she didn't produce what I wanted to see, which I think goes to the merits, he's finding an adverse credibility determination. And I think this is kind of confusing how the IJ and the BIA are presenting this to us because it's not clear to me that it seems like they're conflating the credibility with the merits decision here. I don't think so, Your Honor. And here's why. Remember, we're looking at this under substantial evidence review. So we're looking at whether or not the immigration judge and the agency provided specific evidence in the record to support its decision. Now, you might see, and I think I've heard some indication of it, other areas in the record where you think, well, this might support the petitioner. And here we have what the immigration judge is saying supports the idea that she's not being credible. Under substantial evidence review, you have to determine, in order to deny the — to grant the petition for review, you have to determine that the record compels a different conclusion. And I don't think the record does that either. I think I heard you say in an earlier point in the argument that the IJ asked as corroborating evidence that she produce additional photographs. Did you say that? Yes. Where does the IJ say that? So, in the November 16th, 2015, order, at page 456 of the record, one of the things he indicated there, I believe, were photographs. And you say that she said she had them? Yes. At page 198 in the record, she said she had photographs. She said she handed in the photographs with the registration. That's what she said. And then the registration never came back, which is what she also said. If you look at 198, she said — I'm there. You're there. So lines 2 and 3. I actually had different other photos that I don't have right now with me, and I can submit those. I don't have access to those photos right now. Yep. Where do you see the word access? I'm sorry. I'm on line 4. Oh, you're correct, Your Honor. It does say that. But the line before it, she says I could submit that, those photos, to the court. She says she doesn't have access right now, but there's no indication, at least in this colloquy, that she's never going to get access. But quickly, before my time runs out, I did want to address the 3 v. 2 issue. Yes. That was my next question, because I'd like you to weigh in on that, because I've read all this testimony. I actually have trouble seeing where it's inconsistent. Like, I'm looking at AR-270, and I read the statement, but I don't — it doesn't look inconsistent to me. So help me out how you get to why you imply that that means 3, not 2. Well, so I think I laid this out pretty clearly, I think, in my brief at page 36 of a respondent's brief. She indicates at page 271 that two officers came to her jail cell, and then those who escorted her to the basement, et cetera. And then she indicates, one of the agents told me that he — that no one could find her there. But then she says, after talking about the two agents who escorted her, that another agent in uniform entered the room. And he was — she was sure that it was the last agent who was the boss. If you read this testimony objectively, it indicates that there were three individuals involved. And the immigration judge asked her about that. Let me read this. I'm now on — it appears in a couple of places, but I'm at AR-418. 418? Yeah, yeah. But I'm just reading from the written — from the English translation. Are you with me? I'm at 418, yes. Okay. I'm in the middle of that paragraph in the middle. We drove for about an hour. Once we arrived, the agents escorted me from the car to a basement with no windows. I was frightened and could not understand what was happening. One of the agents told me that no one can find or hear me. After staying for some time in that basement — now, it's not clear that the two agents stayed with her while she's staying in the basement. So one of the agents told me no one can find me. After staying some time in the basement, another agent in uniform entered the room. Now, that might have been one of those first two. I don't know. I was sure the last agent was the boss. The agent told me blah-de-blah. So it's not clear to me that she's talking about three agents. So, Your Honor, this is exactly the point of substantial evidence review, though, because — No, but wait a minute. The I.J. and then the B.I. are holding it against her on the ground that she said there were three. Well, I don't see that she's necessarily saying that there are three. And in her testimony, she's very clear and very consistent, saying there were only two. In her testimony, correct.  I don't see here that it's clear that she's saying that there are three. But, Your Honor, bear with me just for a second. So the immigration judge specifically asked her about this, what he found to be an inconsistency. She responds and she says, no, there were only two. And he says, well, why did you say another? Why did you use the word another after referring to two agents, seemingly implying there are three? She says it's a translation issue. He says, well, wait a second, you know, you had a chance to revise this declaration But she doesn't speak English. She can't read this English. But she said in her testimony that she had the second declaration read back to her, so that she agreed that it was correct. Well, maybe she thought it. I mean, I just read it in English, and it's not clear to me that they were talking about three. And we don't know what it says in Armenian. Okay. Granted. But, Your Honor, the whole basis of substantial evidence review is, yes, you could read that. I could read that just as well and come up with the idea. Well, you know, maybe it's unclear whether it's three or two. But the issue is the immigration judge, who had the ability to observe her demeanor as she answered a question, specifically her response considered it, as this Court requires it to do. Well, her response is it's a translation difficulty. And he didn't believe it. Well, he didn't believe it. She also said translation difficulty when what she meant was something entirely different was left, something entirely else was left out that is to the later meeting. But so she uses translation difficulty, or maybe her translator uses the word translation difficulty in a very broad sense, meaning mistake. Well, okay. But the whole point, though, under substantial evidence review is she had the opportunity to answer the judge's questions. He considered it, and he believed that she was not credible. But does the record compel an opposite conclusion? I don't think so. With respect to the two and three, there may be some other things. But with respect to the two and three, as I read the English that the judge is relying on in order to find an inconsistency, I don't read it. And I'm just reading the English as necessarily producing the inconsistency. And I'm just reading the language, as was the IJ. I mean, I don't need to defer to demeanor or anything else. We're both of us just reading the language. Sure. But I think Your Honor can read that and understand where there's a confusion when you have to be talking about two people and you see another enters the room. So that's what the immigration judge asked about. And when he was consistent in saying there were only two. That's true. But that combined with the demeanor evidence that he pointed out before about how she was being unresponsive, then combined with the fact that this is a persecution claim on account of political activity. And they asked for bylaws, which she said that she once had. They asked for pictures that she said she once had. And she did not provide that. And, you know, this order came out after the close of evidence, where the immigration judge was considering everything, said, you know, I don't quite have enough here to determine whether this was on account of political activity. So he asked in that order at page 456 for the additional evidence. Now, I wanted to address Your Honor's point, if I may. I know I'm well over, but if you could. Last point. Last point. Your Honor's question, referring to Judge Murga, was whether or not there was an additional finding here on persecution. No. In our view, the immigration judge and the board never made an additional finding that even if she was credible, she didn't — this didn't rise to the level of persecution. Rather, the finding was, I don't believe she was credible, and I'm going to take her testimony away and just look at the other objective evidence in the record to see what I have here as far as whether or not that makes a claim of persecution. And he looked at the fact that there were some medical records that said that she got a pregnancy test and that she was in a disoriented state. I'm not sure that those were the exact words, but that was the gist of it. And he looked at what was — what else was provided, and he said, no, on this evidence, this doesn't meet the standard. She didn't meet her burden of proof for asylum. Thank you. So, thank you very much. I'm sorry. Can I ask one last question? And I think your answer can be either yes or no. Sure. If we were to conclude that the adverse credibility finding is not supported and that she is telling the truth, do we need to remand under Ventura to see if this rises to the level of persecution? Because it's obvious to me that it does. But do we need to remand for that conclusion from the IJ or the BIA? You would need to remand, Your Honor. Okay. Got it. Otherwise, you're — Okay. That's all I need to know. Okay. Yeah. Thank you very much. Thank you. Would you put a minute back on the clock? You have a minute. I'll give you for rebuttal if you need it. Your choice. So, if the Court has any questions for me, I'd be willing to answer. It appears not. Okay. Thank you. Thank you. Thank both counsel for your argument this afternoon. Martiosen v. Whitaker is submitted.
judges: McKeown, W. Fletcher, Murguia